UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
TROY ALEXANDER,

                         Plaintiff,

        -v-                                    5:17-CV-1195

CITY OF SYRACUSE; COUNTY OF
ONONDAGA; and DETECTIVE RORY
GILHOOLEY,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CITY OF SYRACUSE and DETECTIVE
RORY GILHOOLEY,

                         Cross-Claimants,

        -v-

COUNTY OF ONONDAGA,

                 Cross-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
COUNTY OF ONONDAGA,

                         Cross-Claimant,

        -v-

CITY OF SYRACUSE and DETECTIVE
RORY GILHOOLEY,

                 Cross-Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

TROY ALEXANDER
Plaintiff *Pro Se*
1906 S. State Street
Syracuse, New York 13205


CITY OF SYRACUSE OFFICE               DANIELLE PIRES, ESQ.
    OF THE CORPORATION COUNSEL      PATRICK R. BLOOD, ESQ.
Attorneys for Defendants City of      SARAH MAE
    Syracuse and Rory Gilhooley          KNICKERBOCKER, ESQ.
233 East Washington Street
Room 300 City Hall
Syracuse, New York 13202


ONONDAGA COUNTY DEPARTMENT            JOHN E. HEISLER, JR. ESQ.
    OF LAW                          KATHERINE B. FELICE, ESQ.
Attorneys for Defendant County of
    Onondaga
John H. Mulroy Civic Center
421 Montgomery Street, 10th Floor
Syracuse, New York 13202


DAVID N. HURD
United States District Judge

# TABLE OF CONTENTS

**I. INTRODUCTION**......................................................................**4**

**II. BACKGROUND**.....................................................................**5**

   A. Police Arrive at Crouse Hospital................................................ 7

   B. Police Seize Plaintiff's House and Cars................................... 12

   C. Investigators Follow Up on Leads .......................................... 13

   D. Warrants, Searches, and Plaintiff's Arrest ........................... 19

   E. Wrapping Up the Investigation ............................................... 21

   F. Plaintiff's Formal Criminal Proceedings ............................... 26

   G. Plaintiff's Civil Procedural History ........................................ 30

**III. LEGAL STANDARD**.........................................................**31**

**IV. DISCUSSION**....................................................................**32**

   A. Search and Seizure of 1906 S. State ....................................... 34

   B. Search and Seizure of Plaintiff's Vehicles............................. 43

   C. False Arrest on October 25, 2016............................................. 46

   D. False Arrest for Failure to Release Plaintiff on Bail.............. 49

   E. Malicious Prosecution............................................................... 53

   F. Plaintiff's Claims Against Onondaga County......................... 61

**V. CONCLUSION**....................................................................**62**

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On October 28, 2017, pro se plaintiff Troy Alexander ("Alexander" or "plaintiff") filed the present complaint.  At its core, that complaint alleges that defendants falsely arrested him, improperly searched his home and seized his vehicles, and initiated a malicious prosecution in the course of investigating a gang rape and torture that apparently occurred from the afternoon of October 23, 2016 until the early morning of October 24, 2016.

Alexander lays the blame for that investigation at the feet of detective Rory Gilhooley ("Gilhooley"), his employer the City of Syracuse ("Syracuse" or the "City" and together with Gilhooley the "City defendants"), as well as on the County of Onondaga ("Onondaga" or the "County").  To right those alleged wrongs, plaintiff invokes his rights under the Constitution of the United States through 42 U.S.C. § 1983 ("§ 1983"), as well as the New York Constitution and common law.

On September 28, 2021, the City defendants filed a motion under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment against Alexander's Second Amended Complaint—the current operative pleading—in

its entirety as to them.[1]  That motion, having been fully briefed, will now be decided on the submissions and without oral argument.

## II.  <u>BACKGROUND</u>

Before delving too deeply into the record, the Court must first clarify what matters for the present motion practice, as well as what does not.  In general, the facts are taken from the moving defendants' statement of material facts where admitted by Alexander or else from other record evidence.  In addition, though, certain of plaintiff's denials to the City defendants' statement of material facts failed to cite to record evidence that supported a factual dispute, contrary to the requirements of the Local Rules of the Northern District of New York.  In the usual case, this would enable the Court to construe those improperly supported denials as admitted.  Local Rule for the Northern District of New York 56.1(b).

However, in deference to Alexander's pro se status and notwithstanding plaintiff's extensive litigation experience, the Court will review the record for evidentiary support for plaintiff's denials even where he does not specifically point the Court to where that evidence might be.  *See Parker v. Fantasia*, 425 F. Supp. 3d 171, 176 n.2 (S.D.N.Y. 2019) (noting that special solicitude afforded to pro se litigants suggests that courts should review record when

---

[1] Curiously, although Onondaga did not oppose that motion, neither did it join it.  Dkt. 120.

pro se plaintiff fails to appropriately respond to defendants' properly supported statement of material facts). Accordingly, any facts that plaintiff disputes and for which the Court has found support in the record are flagged as disputed and described from each party's point of view.

But that preamble only establishes what evidence the Court will consider. How—and whether—that evidence is relevant is a separate issue. To that end, in considering claims of false arrest, unlawful search and seizure, and malicious prosecution, the Court notes at the outset that the truth of the underlying charges or the eventual disposition of Alexander's criminal case are, for the most part, irrelevant to plaintiff's civil case.

After all, one of the City defendants' chief theories on summary judgment is that the police only ever acted when supported by probable cause. And probable cause is not a question of truth: it is one of probability. *See, e.g.*, *Loria v. Gorman*, 306 F.3d 1271, 1288-89 (2d Cir. 2002) (noting that even false complaint can still provide basis for probable cause because important question is whether probability of criminal culpability existed).

Instead, the Court is concerned with whether the police had enough evidence to justify their every action. As a consequence, many of the objections plaintiff makes to the underlying truth of evidence the City defendants had at their disposal are irrelevant. What matters is not whether the story the police were putting together ultimately proved itself to be true,

but whether the police were justified in coming to the conclusions that they did.  *See Loria*, 306 F.3d at 1288-89.  Accordingly, where plaintiff denies the truth of evidence police received—but does not deny the fact that the police received it—the Court will deem admitted the fact that the police were aware of that evidence.

Similarly, Alexander's running hearsay objections in his denials miss the mark.  Hearsay is "a declarant's out-of-court statement offered in evidence to prove the truth of the matter asserted in the statement."  *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (cleaned up) (citing FED. R. EVID. 801(c)).  But again, the eventual truth of a complaint of criminal misconduct is irrelevant to the question of whether the police had probable cause to act on it.  *See Loria*, 306 F.3d at 1288-89.  Instead, these statements have value precisely because the police heard them, whether they are true or not.  Thus, the statements plaintiff objects to are not hearsay and the Court will therefore deem facts subject to plaintiff's hearsay objections to be admitted.

## A. **Police Arrive at Crouse Hospital**

Having cleared up what evidence it will be considering, the Court now turns to the factual background underlying Alexander's claims.  In doing so, it will track the reports the police received and the evidence they recovered.  It will also point out any exculpatory evidence or reasons for pause the police should have had.  Throughout, though, the Court acknowledges up front that

7

plaintiff denies the truth of the underlying charges and will not belabor the point by repeating it every time plaintiff objects.

On Monday, October 24, 2016, at about 3:39 p.m., Syracuse police officers Thomas Lund ("Lund") and Dustin Kiellach ("Kiellach") responded to Crouse Hospital's ("Crouse") Emergency Room.  Dkt. 119-1, Defendants' Statement of Material Facts ("DSMF"), ¶ 8.  Lund and Kiellach had been summoned to Crouse because a patient there, L.M., reported a sexual assault.  *Id.* ¶ 9.

On the way to interview L.M., Lund and Kiellach met Erin Culhane ("Culhane"), a friend of L.M.'s who was waiting outside her room. DSMF ¶ 10.  Culhane told Lund and Kiellach that she had been with L.M. at a residence at 264 McLennan Avenue ("264 McLennan") on the previous day, Sunday, October 23, 2016.  *Id.* ¶ 11.  Apparently, L.M. had left the residence at around 4:00 p.m. with a woman named Samantha.  *Id.*

The next time that Culhane saw L.M. was the next morning, when L.M. returned to 264 McLennan.  DSMF ¶ 12.  Culhane claimed that L.M. was naked.  *Id.*  She apparently also appeared to be "highly intoxicated."  *Id.*  And Culhane reported that L.M. was bleeding heavily from her groin area.  *Id.* Alexander points out, though, and there is some record evidence to support, that L.M. was menstruating on that day.  Dkt. 125-1, p. 45.[2]  In any case,

---

[2] Pagination Corresponds with CM/ECF.

Culhane believed that L.M. had been sexually assaulted, and gave Lund and Kiellach the bloody underwear that L.M. had worn after she returned to 264 McLennan.[3]  DSMF ¶ 13.

Lund then entered L.M.'s room.  DSMF ¶ 14.  She appeared to be drowsy, and the officers detected a number of visible injuries.  *Id.*  Even so, L.M. told Lund and Kiellach what she claimed happened after she left 264 McLennan.  *See id.* ¶ 15.

Apparently, L.M. went with Samantha to her house, 1906 South State Street ("1906 S. State") in Syracuse.  DSMF ¶¶ 1, 15.  1906 S. State belongs to Alexander.  *Id.* ¶ 17.  L.M. told Lund that the house had a reputation as a brothel, and that she had worked there as a prostitute.  *Id.* ¶ 16.  L.M. further claimed that she would have to pay plaintiff so that she would be allowed to work from his house.  *Id.* ¶ 17.

According to Lund's report, L.M. told him that when she and Samantha arrived at 1906 S. State, two women, Lauren and Sheena,[4] and a male blocked her from leaving.  DSMF ¶ 19.  They then forced her into the basement.  *Id.*  In the basement was some kind of wooden bench.  *Id.*  L.M.

---

[3] It is not entirely clear from Culhane's first statement whether L.M. was naked but for the underwear when she returned to 264 McLennan or whether she was naked and then put on underwear when she got home.  Subsequent reports nevertheless suggest that plaintiff was wearing the underwear when she got home.

[4] Defendants redacted Lauren and Sheena's names in most submissions because they were co-defendants in plaintiff's criminal prosecution.  Although both feature prominently in L.M.'s complaint, neither is critical to plaintiff's.  Accordingly, the Court will not refer to either by her full name.

claimed that she was blindfolded soon after being brought down. *Id.* Then, L.M. told the police that her assailants tied her to the bench. *Id.* Next, she claimed that they superglued her lips together. *Id.* Lund observed "a white substance and peeled skin" on L.M.'s lips, which he believed were both consistent with L.M.'s claim.[5] *Id.* ¶ 22.

Immobilized, blinded, and silenced, L.M. told Lund that her captors then stripped her of her clothes. DSMF ¶ 19. Next, L.M. related that they began to burn her with lit cigarettes. *Id.* Lund apparently believed L.M. on this point as well, because he noticed "what appeared to be" cigarette burns on the right side of L.M.'s face and her shoulder. *Id.* ¶ 22. L.M. also elaborated that her assailants repeatedly injected her with what she believed to be drugs. *Id.* ¶ 19. Then she was left alone in the basement for a long while, though L.M. is unsure exactly how long. *Id.*

L.M. also claimed that some time afterwards, someone turned her body so that she was on her knees on the bench. DSMF ¶ 20. To hear L.M. tell it, an "unknown male" then anally raped her. *Id.* Someone also "forced her glued mouth open and forced her to perform oral sex." *Id.* Afterward, Lauren and

---

[5] Plaintiff denies that these injuries occurred at 1906 S. State and instead claims that they were old injuries as proven by the lack of photographs supporting them and one witness's statement as will be discussed below. None of that serves to disprove that the police noticed the injuries or had any reason to believe that they did not come about in the way L.M. described. Once again, because the Court is primarily concerned with what information the police had available to them during the investigation, the uncontested fact that Lund observed L.M.'s injuries must be deemed admitted.

Sheena allegedly washed her in a shower.  *Id.*  In the process, though, L.M. claims that they told her that if she spoke to the police, she would end up like "Seven," which was apparently a reference to a man named Darrell Johnson, who died in May of 2016 of a drug overdose.  *Id.* ¶¶ 20-21.  According to L.M., the two women claimed to have been involved in his death.  *Id.* ¶ 21.

At that point, L.M. was unable to continue speaking with the police. DSMF ¶ 23.  Before leaving the room, however, Lund apparently also noticed that L.M. had abrasions on her left wrist, four cuts that appeared to be from a multi-blade razor, needle marks on both of her hands consistent with injection marks, and other varied bruises and abrasions.  *Id.* ¶ 22.

L.M.'s attending physician then explained to Lund that L.M.'s x-rays had shown a detachable, multi-blade shaving razor stuck in her anal cavity. DSMF ¶ 24.  L.M. would need surgery to remove it.  *Id.*

Lund reported L.M.'s story up his chain of command, and a detective Thomas Skardinski ("Skardinski") was sent to Crouse to investigate further. DSMF ¶ 25.  Skardinski got much the same information out of both Culhane and L.M. that Lund had.  *See id.* ¶¶ 27-30.  The only new wrinkle Skardinski learned was that Culhane also lived at 264 McLennan with L.M. and Keith Lawrence ("Lawrence"), who Culhane described as L.M.'s boyfriend.  *Id.* ¶ 29. After that, Lund headed for 1906 S. State while a Sexual Assault Nurse Examiner performed a sexual assault test kit on L.M.  *Id.* ¶ 33.

## B. Police Seize Plaintiff's House and Cars

At about 6:50 p.m. on October 24, 2016, defendant detective Gilhooley joined Lund and other Syracuse police officers at 1906 S. State, where he took the lead on the investigation.  DSMF ¶¶ 34-35.  Gilhooley began by talking to Lund about what he had learned from L.M.  *Id.* ¶ 40.  Once he was up to speed, he knocked on the front door.  *Id.*

There were a number of people who could have answered.  Alexander lived at 1906 S. State, but so did his brother, his father, a Samantha Fisher-Davis ("Fisher-Davis"), and Sheena.  DSMF ¶ 41.  Theresa Smith ("Smith"), plaintiff's father's girlfriend, was also a periodic visitor.  *Id.* ¶ 42.  As it turned out, Smith was the one who answered the door to Gilhooley's knocking.  *Id.* ¶ 43.

Gilhooley identified himself and asked to enter the house to speak with the people that lived there.  DSMF ¶ 43.  According to the City defendants, Smith said yes.  *Id.*  But according to Alexander and a sworn affidavit by Smith, the police simply pushed their way into the house.  Dkt. 125-1, p. 58.

Once inside, Gilhooley found most of the occupants in the downstairs living room[6] and found Alexander in an upstairs bathroom.  DSMF ¶¶ 46-48.  According to the City defendants, the police ordered the occupants out of the

---

[6] Sheena was not there, apparently because she and Lauren had overdosed that morning and were in the hospital.  DSMF ¶ 49.

house until they could get a warrant to search it.  DSMF ¶ 51.  However, plaintiff denies this fact and claims that his mother was never told not to enter the house and neither was Fisher-Davis.  Dkt. 125, Plaintiff's Statement of Material Facts ("PSMF"), ¶ 51.  Plaintiff also claims that Gilhooley and the other police officers directed him to unlock any doors in the house.  Dkt. 119-2 ("Pl. Dep.") p. 93.  In any case, plaintiff left the house, but waited outside it until the next morning.  DSMF ¶ 52.

After he had assured himself that the house was secure, Gilhooley noticed three vehicles sitting in Alexander's driveway.  DSMF ¶ 54.  One of them was covered and plays no further part in this case.  *Id.*  The other two were more exposed, so Gilhooley looked through the windows with his flashlight.  *Id.* ¶ 55.  In the process, Gilhooley saw what he believed at the time to be blood on the driver's seat of one vehicle and on the rear driver's side seat of the other.  *Id.*  Both vehicles belonged to plaintiff.  *Id.* ¶ 56.  Based on his perception of blood and the allegations that L.M. had been bleeding from her groin area, Gilhooley ordered a tow truck to take the two vehicles to a forensics lab for testing.  DSMF ¶ 58.

### C. **Investigators Follow Up on Leads**

While Gilhooley oversaw the seizure of 1906 S. State, the police were following four other investigative threads, each at roughly the same time. For the first thread, they suspected that the Fisher-Davis who lived with

Alexander might be the "Samantha" who L.M. left 264 McClennan with on the afternoon of October 23.  Dkt. 119-19, p. 2.  To verify that suspicion, the officers took a picture of Fisher-Davis and texted it to another detective who had stayed behind with Culhane and L.M.  *Id.*  Culhane confirmed that Fisher-Davis was who she had seen with L.M., so the police brought Fisher-Davis to the station for questioning, apparently of her own volition.  *Id.* at 2-3.

As Alexander points out, Fisher-Davis began by telling Skardinski, the investigator questioning her, that she noticed cuts on L.M.'s forearms, swelling on her lip, needle marks on her arms, and that she was intoxicated when she first saw her in the early afternoon of October 23.  Dkt. 119-19, p. 3.  Fisher-Davis also derided L.M. as a "pathological liar" who was "starving for attention" and "selling her body."  *Id.*  She further claimed that L.M.'s boyfriend, Lawrence, was the actual abuser.  *Id.*

As the interview continued, though, detectives began to notice that Fisher-Davis knew details that could not be explained by having seen L.M. with preexisting injuries on October 23.  Dkt. 119-19, p. 3.  By way of example, Fisher-Davis knew that L.M. had had a razor lodged in her anal cavity.  *Id.*  She also knew that L.M. had had her lips glued together and had been dropped off naked.  *Id.*  Fisher-Davis apparently explained that she

knew these details because "Cleave," an acquaintance of Lawrence's, had called her and accused the same two women that L.M. had identified. *Id.*

If nothing else, Fisher-Davis's mention of Lauren and Sheena piqued Skardinski's interest, and he asked her where he could find them. Dkt. 119-19, p. 3. Fisher-Davis demurred, saying only that Alexander told her they had both "passed out" and gone to the hospital. *Id.* She did elaborate, however, that L.M. had apparently gotten into a fight with Lauren and Sheena over L.M. stealing some of their clothes and wearing them to 1906 S. State on October 23. *Id.* Somehow, the clothes stayed behind when L.M. had left. *Id.* After the interview, Fisher-Davis was allowed to return to 1906 S. State. *Id.* at 4.

The second investigative thread the police followed involved Gilhooley's efforts to get some more information about Alexander. Specifically, Gilhooley returned to the station from 1906 S. State to get search warrants ready for the house and plaintiff's two seized cars. DSMF ¶ 60. In the process of filling the warrant out, Gilhooley asked another detective if plaintiff had any priors for prostitution or sex abuse crimes. *Id.* ¶ 61. Apparently, this detective told Gilhooley that plaintiff had a reputation for running drugs and prostitutes out of his house. *Id.* ¶ 62.

The third line of new information came to light at 1906 S. State itself. At some point, one of the officers on duty there noticed a woman—later

identified as Alexander's cousin, Tereia Duff ("Duff")—talking to plaintiff.
DSMF ¶¶ 72-73; Dkt. 119-27, p. 1.  Not long after, a traffic incident drew the
officers' attention away from the house.  *Id.* ¶ 74.  Once he was sure that the
situation on the street was under control, the same officer who had noticed
Duff earlier went inside the house.  *Id.* ¶ 75.  Curiously, he heard noise
coming from upstairs.  *Id.*

The officer followed the sound to the second floor, where he saw Duff
running toward the attic bedroom—Alexander's bedroom.  DSMF ¶¶ 75-76.
The officer managed to catch Duff and got her out of the house.  *Id.* ¶ 77.
While she was being questioned, Duff spat out a plastic bag with some kind of
brown plant in it and showed the officers a solitary key.  DSMF ¶ 77.
Ultimately, Duff told the officers that the key belonged to plaintiff, and that
he had given it to her to use to retrieve his phone.  Dkt. 119-27, pp. 1-2.

The fourth and final lead the police followed was to continue to talk to
L.M. and the people close to her.  At around 8:00 a.m. on Tuesday, October
25, 2016, detectives Jacquelyn Phinney ("Phinney") and Pauline Burnett
("Burnett") started their scheduled shifts in Syracuse Police Department's
Abused Persons Unit.  DSMF ¶ 88.  L.M. had apparently been released from
Crouse, so Phinney and Burnett went to 264 McLennan hoping to speak to
her.  *Id.* ¶¶ 92-93.  But no one was home.  *Id.* ¶ 93.  Instead, they managed to

get a hold of L.M.'s mother over the phone, and eventually went to her house
for an interview.  *Id.* ¶ 94.

L.M.'s mother confirmed that she had spoken to Culhane on the phone on
October 24.  DSMF ¶ 95.  Culhane had apparently told her that L.M. had
been raped at "Troy's"—which the police apparently presumed meant
Alexander—and needed to go to the hospital.  *Id.*  L.M.'s mother also told the
officers that drugs and prostitution had been part of L.M.'s life since her
"early teens."  *Id.* ¶ 96.  Specifically, L.M.'s mother said that "Troy" was her
"pimp."  *Id.*

To follow up, Burnett and Phinney went back to 264 McLennan at 11:15
a.m.  DSMF ¶ 107.  This time, the detectives found Culhane, Lawrence, and
L.M. all together.  *Id.* ¶ 108.  L.M. gave the bones of the same story for a
third time to match her recitations to Lund and Skardinski.  *Id.* ¶ 109.  But
she would not identify any of the males involved in the assault.  *Id.* ¶ 110.
Phinney attributed her reticence to fear of retaliation.  *Id.* ¶ 111.

Culhane also gave another rendition of her version of what happened on
October 23, 2016.  DSMF ¶ 112.  The only thing that she had to add was that
at 11:45 a.m. on Monday, Sheena had called Lawrence.  *Id.*  Once Culhane
realized who was on the other end of the phone, she snatched it from
Lawrence and told Shena she would alert the police to what happened to
L.M.  *Id.* ¶ 113.  According to Culhane, she responded by threatening that

17

Culhane would "end up tied up in the basement too." *Id.* ¶ 114.  Culhane also claimed that Fisher-Davis had called Lawrence and admitted to hearing screams in the basement on the night of October 23, but that she was not involved.  *Id.* ¶ 116.

At some point on Tuesday, October 25, 2016, the police also spoke to Lawrence.  Dkt. 125-1, p. 53.  Lawrence explained that there was bad blood between L.M. and Lauren because L.M. had taken Lauren's job as Lawrence's "main girl."  *Id.*

Lawrence elaborated that he told L.M. to stay away from Alexander. Dkt. 125-1, p. 53.  Apparently, Darrell Johnson or "Seven" was Larence's brother, and he believed that plaintiff had been involved in his brother's overdose on May 21, 2016.  To hear Lawrence tell it, L.M. ignored his warning and went to 1906 S. State anyway to "make some money and get some powder."  *Id.*  Along the way, L.M. planned on stealing oxycontin pills from her mother, which Lawrence claimed she did.  *Id.*

Over the course of the night of Sunday, October 23, 2016 and the morning of October 24, Lawrence claimed that Fisher-Davis called him a few times to ask about L.M.'s condition.  Dkt. 125-1, p. 54.  After that, L.M. arrived at his doorstep at 4:15 a.m. wearing nothing but a pair of underwear.  *Id.*  L.M. was upset and tried to flee the house, but Lawrence stopped her, even going so far as to grab her by her hair to pull her back in.  *Id.*  L.M. initially claimed that

she had simply woken up in a ditch on the north side of Syracuse, but when Lawrence challenged her, she claimed that she had been raped, burned with cigarettes, and had her lips glued shut. *Id.*

Apparently concerned that Lawrence might have been involved in L.M.'s attack, the detectives asked for Lawrence's permission to look at his basement. Dkt. 125-1, p. 54. Lawrence agreed, but the detectives did not see anything like any of the objects L.M. had described. *Id.* On their way out of the house, L.M. confronted the detectives and admonished them for searching 264 McLennan when she claimed the sexual assault did not occur there. *Id.*

### D. Warrants, Searches, and Plaintiff's Arrest

At 8:30 a.m. on Tuesday, October 25, 2016, Gilhooley put together a warrant application to search 1906 S. State and the two seized cars. DSMF ¶¶ 82, 87. He based the warrant application on Lund and Skardinski's reports, as well as the report concerning Duff's ill-fated break-in.[7] *Id.* ¶ 85.

At 10:15 a.m., a Syracuse City Court Judge signed the search warrants. DSMF ¶ 98. Armed with judicial authority, Gilhooley returned to 1906 S. State to search the house. *Id.* ¶ 99. Between noon and 1:00 p.m., while the

---

[7] Phinney and Burnett were in the beginning stages of their own investigation, so Gilhooley did not have their information at his disposal in swearing out the affidavit requesting the search warrants.

search was still ongoing, Alexander returned home from work. *Id.* ¶ 100.

According to Gilhooley, he arrested plaintiff on the spot for Second Degree

Burglary, Fourth Degree Conspiracy, Fourth Degree Criminal Facilitation,

and Fourth Degree Criminal Solicitation for his role in Duff's break-in the

day before. *Id.* ¶¶ 101-03.

But according to Alexander, Gilhooley only arrested him after he had been

waiting outside for half an hour and had expressed an intention to go to a

store across the street to get its surveillance video.  PSMF ¶ 102.  Defendants

nevertheless acknowledge that plaintiff had mentioned the camera from the

store during the arrest and would later retrieve the footage it had captured

between October 23-25, 2016.  DSMF ¶¶ 104-05.

The video is "grainy," and the City defendants do not pretend that it did

an overwhelming amount to advance their interests. *See* Dkt. 119-17, p. 13.

However, as Alexander points out, the video shows that none of his vehicles

moved at any point between when he came home at 4:00 p.m. on Sunday,

October 23, 2016 and when he went to work at 5:46 a.m. on Monday, October

24, 2016.  PSMF ¶ 149.  However, Phinney noted that there was otherwise

ample traffic captured on camera during that timeframe.  Dkt. 119-17, p. 13.

At around the same time, Phinney and Burnett were wrapping up their

interviews with L.M. and Culhane and headed over to 1906 S. State.

DSMF ¶ 117.  Once there, they joined the search of the house. *Id.*  They did

not find anything like the bench L.M. described in its basement.  *Id.* ¶ 118.

But they did find clothing that looked like what L.M. claimed she wore to

1906 S. State on the night of October 23.  *Id.*

Phinney and Burnett brought Culhane and L.M. to the crime scene to

confirm both the absence of the bench and the presence of her clothes.

DSMF ¶ 121.  L.M. agreed that nothing there looked like the bench she had

been tied to and she suggested that it must have been moved.  *Id.* ¶ 122.  But

both L.M. and Culhane identified a sweater and a boot found upstairs as

belonging to L.M. while out of each other's earshot.  *Id.* ¶¶ 123-24.

**E. Wrapping Up the Investigation**

Phinney and Burnett then took L.M. back to their office to take a final

written statement.  DSMF ¶ 126.  That statement elaborates that L.M. and

Fisher-Davis had been at 1906 S. State earlier in the day on October 23,

2016, but that L.M. had left money in Fisher-Davis's room.  *Id.*  When they

got to the room, the door closed.  *Id.*  Lauren and Sheena, along with three

males, were in the room stopping L.M. from leaving.  *Id.*

Otherwise, the details are largely the same.  DSMF ¶ 126.  L.M. describes

being tied naked to a wooden bench while being blindfolded and having her

lips glued together.  *Id.*  She felt like she was in the basement for hours while

her captors taunted her, burned her with cigarettes, urinated on her, and

injected drugs into her hand.  *Id.*  She was then anally and orally raped.  *Id.*
Then they showered her off and she walked home.  *Id.*

Meanwhile, Lauren and Sheena were released from the hospital after
their overdoses and returned to 1906 S. State.  DSMF ¶ 128.  The police
interviewed Sheena at around 11:30 a.m. on Tuesday, October 25.  *Id.* ¶ 129.
Sheena acknowledged that she did not own any clothes like those that L.M.
had found in her room, but denied any involvement in a rape.  *Id.* ¶¶ 129,
132.  Instead, she claimed that L.M. had blamed Lawrence for assaulting her
and dislocating her jaw.  Dkt. 119-21, p. 3.  However, Sheena also admitted
that Lawrence had called her shortly after L.M. left 1906 S. State—sometime
after 3:00a.m.—and demanded to know what had happened to L.M.  *Id.*
¶ 134.

Lauren also got in touch with the police and agreed to come in for an
interview with Burnett.  DSMF ¶ 135.  Much like Sheena, Lauren claimed
innocence, and told the investigators that Lawrence had beaten L.M.
*Id.* ¶ 137.  At first, Lauren said she knew none of the details of L.M.'s claimed
assault, but later she recanted and claimed that Lawrence had called her and
accused her of gluing L.M.'s mouth closed and inserting a razorblade into her
rectum.  Dkt. 119-18, p. 3.  She eventually claimed that Lawrence and
Alexander ran rival prostitution rings, but that her only role was driving girls
to jobs for plaintiff.  *Id.*  Burnett ultimately found her to be untruthful, and

arrested her.  DSMF ¶ 140.  Both women were charged with First Degree

Criminal Sex Act, First Degree Unlawful Imprisonment, and Third Degree

Criminal Assault.  *Id.* ¶ 141.

Meanwhile, detectives back at 1906 S. State were putting the finishing

touches on the search of the house.  That meant searching Alexander's attic

bedroom.  DSMF ¶ 142.  In plaintiff's room, the police found a "beige chunky

substance," three scales with powder residue, and a grinder, on top of a

dresser.[8]  *Id.*  In the dresser's top drawer were a cutting agent, "hundreds" of

Ziplock bags, and personal papers in plaintiff's name.  *Id.*  The beige

substance tested positive for cocaine.  *Id.* ¶ 143.

Based on the cocaine found in Alexander's room, the police tacked on five

new charges to the four plaintiff was already facing: (1) two counts of Seventh

Degree Criminal Possession of a Controlled Substance; (2) Third Degree

Criminal Possession of a Controlled Substance; (3) Second Degree Criminal

Use of Drug Paraphernalia for the diluents; (4) Second Degree Criminal Use

of Drug Paraphernalia for the packaging materials; and (5) Second Degree

Criminal Use of Drug Paraphernalia for the scales.  DSMF ¶ 146.

---

[8] Plaintiff denies that the beige chunky substance was found in his room.  PSMF ¶ 142.  He does not, however, point to any record evidence to indicate that it was found elsewhere or even explained how he could have known where it was found.  *See id.*  Neither has the Court found any support for this denial in the record.  This fact must be deemed admitted.

After the search, Lawrence apparently reached out to the Abused Persons Unit "several times" on October 27, 2016.  Dkt. 125-1, p. 64.  Lawrence told investigators that he believed a man he called "Q" was involved in L.M.'s attack because Lawrence owed him $1,000.00 for an "unpaid drug debt" and L.M. had mentioned that one of her attackers had said something about being owed money.  *Id.*

Detectives met with Lawrence on October 28, 2016.  Dkt. 125-1, p. 64.  During the course of their interview, Lawrence acknowledged that L.M. had never mentioned Q until he had brought up the name.  *Id.*  Despite that, Lawrence explained that he had called Q and demanded a bribe of $500 worth of drugs or else he would try to get Q charged with L.M.'s rape.  *Id.* at 65.  Lawrence styled this as a "test," because if Q agreed to pay, Lawrence would confirm his guilt and blow him in anyway.  *Id.*

Lawrence then put the police in touch with Q, who turned out to be named Quinete Jackson ("Jackson").  Dkt. 125-1, p. 65.  Jackson consented to be interviewed, denied any involvement, and provided a corroborated alibi.  *Id.* at 65-66.

The final stage of the investigation involved bringing L.M. to the District Attorney's Office for another statement on Friday, October 28, 2016.  DSMF ¶¶ 152-53.  Once again, the bones of L.M.'s story were the same, but

she provided a few more details and certain portions of the story were different.

This time, L.M. claimed that she had been at 1906 S. State using cocaine and crack with Fisher-Davis while the Lauren and Sheena were in the next bedroom.  DSMF ¶ 154.  When the drugs ran out, L.M. decided to leave.  *Id.*  But once again, she claimed that she was blocked by the two women, and three men subsequently took her down, stripped her, and tied her up.  *Id.*

L.M. then repeated the same details of having cigarettes put out on her face and back.  DSMF ¶ 154.  Once the police explained that they had spoken to Lawrence as well, however, L.M. claimed that Alexander was directly involved.  *Id.*  She first mentioned him by explaining that someone had told her they were going to go talk to plaintiff before leaving her alone downstairs for a few hours.  *Id.*  L.M. also identified plaintiff as the person who orally raped her and who retied her on her knees.  *Id.*  Apparently, L.M. explained that she had been hesitant to mention plaintiff earlier, because he had threatened to kill her and her family if she told anyone.  *Id.*

From there, L.M. also explained that she had been dragged to three different locations that night, but between being drugged and blindfolded she could not elaborate much further.  DSMF ¶ 154.  She did, however, claim that she had been taken to a second basement by plaintiff where she was sexually assaulted again.  *Id.*

When the police pressed L.M. as to who she could identify with certainty, she said that Alexander, a man who went by "Chills," Lauren, and Sheena were all present during her rape. DSMF ¶ 154. She also said that she believed Jackson was there because she claimed someone spoke to plaintiff about Lawrence owing him money, and L.M. knew of no other people Lawrence owed. *Id.* L.M. also claimed that Fisher-Davis was there for part of the encounter, but she left after the assailants started putting cigarettes out on L.M.'s body. *Id.*

The investigators then tried to get L.M. to identify the males present for the attack based on photo arrays. DSMF ¶ 157. But L.M. demurred, claiming that she would not identify anyone even if she could, because she feared for her safety. *Id.* As a result, the detectives arranged for L.M. to be taken to a secure location. *Id.* ¶ 156. After L.M.'s narration to the District Attorney's Office, Alexander was charged with First Degree Criminal Sex Act.[9] *Id.* ¶ 158.

**F. Plaintiff's Formal Criminal Proceedings**

The same day, L.M. testified before a grand jury. DSMF ¶ 159. She repeated the fundamental details of her story for a fifth time. But once again, there were some variations. For example, L.M. testified that she

---

[9] The record is not clear when, precisely, plaintiff was charged. *See* Dkt. 119-9, ¶¶ 44 (providing no date for when plaintiff was charged); *but see* Pl. Dep. 115 (claiming to have been charged with sexual assault for first time on Sunday, October 30, 2016).

bought and borrowed cocaine from Alexander on October 23, 2016.
DSMF ¶ 161. She also claimed that plaintiff was not one of the three men
who initially confronted her. DSMF ¶ 166. Instead, she claimed that one
was Q, another was Chills, and the third she knew but could not remember
his name. *Id.*

L.M. also claimed for the first time before the grand jury that after she
had been left alone in the basement for a few hours, Alexander had come
downstairs and told her that they could "either do this the easy way or the
hard way," which L.M. believed meant he wanted her to work as a prostitute
for him. DSMF ¶ 172. L.M. testified that she panicked when plaintiff
delivered the ultimatum, at which point plaintiff allegedly grabbed her by the
throat and insisted that she would work. *Id.* ¶ 177. L.M. then testified that
plaintiff went upstairs and announced that plaintiff was "ready." *Id.*

L.M. next claimed that Chills was the one to anally rape her and that Q
also penetrated her, although she could not clarify how, apparently because
she was in so much pain from Chills' attack. DSMF ¶ 181-82. She
nevertheless repeated that Alexander was the one who forced her into oral
sex and ripped her glued mouth open. *Id.* ¶ 183. Otherwise, she repeated
her claim that the participants urinated on her. *Id.* ¶¶ 179, 184.

After that, L.M. testified that Alexander repeated that he would "make his
money if [she] liked it or not." DSMF ¶ 185. She claims that plaintiff then

loaded her in a car and took her to Jackson's house.  *Id.* ¶¶ 186-87.  Once there, L.M. claimed that Jackson paid plaintiff some money.  *Id.* ¶ 188.  After that, she claimed she experienced still more sexual assault, which she said Jackson claimed was payback for the money Lawrence owed him.  *Id.* ¶ 189.

L.M. also testified that after a few more hours, Alexander let her out of Q's basement.  *Id.* ¶ 190.  She claimed that he then drove her back to 1906 S. South and threatened her life if she told anyone what happened.  *Id.* ¶¶ 190-91.  At that point, L.M. fled from the house.  *Id.* ¶ 193.

The rest of L.M.'s grand jury testimony is not dissimilar from L.M.'s other versions, and the Court need not repeat it any further.  In any case, on November 4, 2016, the grand jury voted to true-bill Alexander.  DSMF ¶ 197.  An indictment for First Degree Unlawful Imprisonment followed.  *Id.*

Phinney and Burnett spent the next few months tying up some loose ends in the investigation.  DSMF ¶ 198.  On January 17, 2017, they finally tracked down Lawrence's friend "Cleave," who turned out to be Cleavern Starling ("Starling").  *Id.* ¶ 199.  He told the investigators that he had heard about what happened to L.M.  *Id.*  Specifically, he claimed to have heard that a sex toy with razor blades stuck to the tip had been inserted into L.M.'s anus, which was how the razor blades became lodged in her rectum.  *Id.* ¶ 200.  When pressed for how he came across that information, Starling claimed that

he could not remember, but that he might have heard it from L.M. herself. *Id.* ¶ 201.

Meanwhile, the hard forensic evidence that the police had obtained bore precious little fruit. The police had taken a perianal swab of L.M. and recovered a spermatozoan. Dkt. 119-17, p. 14. They had also detected "a small amount of male DNA" on her mouth. *Id.* But there was no semen recovered on the vaginal, vulvar, cervical, anal, and oral swabs they had taken. *Id.* They also failed to find any conclusive results from any blood tests. *Id.* To make the investigation's prospects even dimmer, L.M. continued to abuse drugs. DSMF ¶ 204. Eventually the detectives stopped contacting her. *Id.*

On August 22, 2017, Assistant District Attorney Maureen Barry ("Barry") dismissed the felony charges against Alexander and the two women. DSMF ¶ 205. Barry explained that the complete lack of hard evidence coupled with the unreliability of L.M.'s testimony considering her life-threatening levels of intoxication during the assault bound her to dismiss the charges. *Id.* ¶ 206.

On March 28, 2018, Alexander pled guilty to an unrelated, subsequent charge. DSMF ¶ 220. As part of the plea deal, the District Attorney considered the lone remaining drug charge from the October 2016 arrest to be satisfied. *Id.* ¶ 221. Plaintiff was sentenced to time served and released on

March 28, 2018. *Id.* ¶ 223.  About two weeks after plaintiff's release, L.M. died, apparently of a drug overdose. *Id.* ¶ 224.

### G. Plaintiff's Civil Procedural History

Even before Alexander's criminal case came to a conclusion, he had filed a Notice of Claim on November 28, 2016 for "the arrest and imprisonment and wrongfull [sic] impoundment" of his vehicles, as well as for the bail money he had spent. DSMF ¶ 209.  Plaintiff also filed an Article 78 proceeding in New York State Supreme Court, Onondaga County on the same day. *Id.* ¶ 210.

On April 5, 2017, Alexander filed a small claims complaint in Syracuse City Court challenging his prosecution. DSMF ¶ 212.  Plaintiff's objective was to recover his attorney's fees and towing costs incurred defending himself and getting his property back. *Id.*  Neither the Article 78 proceeding nor the April 5, 2017 small claims action afforded plaintiff any relief. *Id.* ¶¶ 211, 213-18.  Plaintiff also filed yet another notice of claim concerning the impoundment of his vehicles and the search of his home on September 11, 2017. *Id.* ¶ 215.

Apparently dissatisfied with his other recompensatory overtures, on October 28, 2017, Alexander—then represented by counsel—filed the initial complaint in this case. Dkt. 1. On December 13, 2018, this Court granted in part a motion to dismiss plaintiff's complaint brought by the City defendants. Dkt. 51. In the aftermath of that bout of motion practice, the following

claims remained active: (1) an unreasonable search and seizure claim under § 1983 based on the seizure and subsequent search of plaintiff's house and cars; (2) a claim for false arrest under § 1983 and New York State common law for arresting plaintiff on October 25, 2016; (3) a malicious prosecution claim under § 1983 and New York State common law;[10] and (4) a false imprisonment claim for failing to release plaintiff after he made bail.[11]  *See* Dkt. 51, p. 24.  On September 28, 2021, the City defendants moved for summary judgment against all of plaintiff's remaining claims against them under Rule 56.  Dkt. 119.  This decision follows.

## III. <u>LEGAL STANDARD</u>

Summary judgment under Rule 56 is warranted if the parties' submissions show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing Fed. R. Civ. P. 56(a)).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of a material fact is "genuine" if "the evidence is such that a reasonable jury could

---

[10] The § 1983 claims only remain against Gilhooley and the County.  This Court previously held that plaintiff failed to state a claim for municipal liability under § 1983 against the City.  Dkt. 51, p. 24.  However, the County failed to move to dismiss any claims at all, so the municipal liability claims against them linger on.  *See id.* at 2 (noting that County answered complaint without filing motion to dismiss).

[11] This last claim was not formally identified in the complaint, but it was at least mentioned. Dkt. 39, ¶ 70.  The Court will recognize it in deference to plaintiff's pro se status.

return a verdict for the nonmoving party." *Id.* The movant bears the burden of pointing the court to the materials that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Additionally, a court considering a summary judgment motion "must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)). Even so, a non-movant's conclusory allegations without support from record evidence are insufficient: the non-movant must "put up or shut up." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000). At bottom, summary judgment tasks the Court with assessing the assembled evidence and determining whether a reasonable factfinder could find in the nonmovant's favor. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

## IV. <u>DISCUSSION</u>

Though the City defendants have raised a range of defenses to the complaint, at the heart of the parties' disputes is whether the police had probable cause at each critical stage of their investigation. As will be fleshed out more fully below, probable cause functions as either a complete defense or as a preliminary step to a complete defense for each of Alexander's claims

except for his claim concerning defendants' alleged failure to release him on bail. To that end, it seems prudent to begin by explaining what probable cause is in the context of both a search and a seizure, including an arrest.

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). Probable cause to search turns on the same quantum of evidence, but instead focuses on "whether the available facts warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *United States v. Pabon*, 871 F.3d 164, 181-82 (2d Cir. 2017) (internal citations and quotation marks omitted).

The probable cause inquiry looks at "the totality of the circumstances," and "should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury v. Wertman*, 721 F.3d 84, 92-93 (2d Cir. 2013) (citation omitted).

Obviously, though, this standard is fluid and "does not demand hard certainties," "mechanistic inquiries," or even that an officer's "good-faith belief that a suspect has committed or is committing a crime be correct or

more likely true than false." *Figueroa v. Mazza*, 825 F.3d 89, 99

(2d Cir. 2016) (internal citations and quotation marks omitted).  Instead,

probable cause looks for "'the kind of fair probability' on which a 'reasonable

and prudent' person, as opposed to a 'legal technician,' would rely." *Id.*

(cleaned up) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

Of particular importance in a probable cause analysis is a victim's

complaint, because courts assume "[t]he veracity of citizen complaints [by]

the victims of the very crime they report to the police . . . ." *Miloslavsky v.*

*AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992).

## A. <u>Search and Seizure of 1906 S. State</u>

Now that the Court has settled the factual universe involved in this case

and has established some background principles, it is finally free to turn to

the merits of Alexander's complaint and evidence on the one hand against the

City defendants' motion on the other.  To follow the chronology of the

investigation, the Court begins by considering plaintiff's claims for illegal

search and seizure of his house and cars.

To that end, the Fourth Amendment "does not proscribe all searches and

seizures, but only those that are unreasonable." *Skinner v. Ry. Labor Execs.'*

*Ass'n*, 489 U.S. 602, 619 (1989).  In the usual case, a warrantless search—

especially of a home—is "presumptively unreasonable." *Harris v. O'Hare*,

770 F.3d 224, 231 (2d Cir. 2014).  However, police officers with probable

cause can, in exigent circumstances, nevertheless lawfully enter a home and/or search property.  *Id.*

Proving that exigent circumstances excused the typical requirement of a warrant saddles the police with a "heavy burden."  *Harris*, 770 F.3d at 234. Whether exigent circumstances existed during an intrusion on a plaintiff's property is an objective test contemplating "the totality of circumstances confronting law enforcement agents in the particular case."  *Id.*

To help focus the inquiry, the Second Circuit often leans on six guideposts to determine whether exigent circumstances existed:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*Harris*, 770 F.3d at 234 (cleaned up) (citing *United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012)).  Among those six factors, the "gravity of the underlying offense" is "an important part of [the] constitutional analysis."  *Welsh v. Wisconsin*, 466 U.S. 740, 751-52 (1984).

In addition, though, courts looking at the exigence of circumstances also often consider "whether quick action is necessary to prevent the destruction of evidence." *Moreno*, 701 F.3d at 73 (cleaned up) (citing *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995)).  Ultimately, courts are charged with determining "whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action." *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011).

From the jump, there are two flashpoints at issue concerning 1906 S. State.  The first, its seizure on Monday, October 24, 2016, was without a warrant, and thus the City defendants cannot be held liable for this seizure if they can prove both probable cause that they would find evidence of a crime and exigent circumstances.  *Harris*, 770 F.3d at 231.

Naturally, then, the first issue to sort out is whether a reasonable officer would believe that there was evidence of a crime or contraband at 1906 S. State when Gilhooley first seized the house.  That question is simple enough to resolve.  To begin, under the collective knowledge doctrine, "an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search

was known by other law enforcement officials initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

In a practical sense, then, the Court assumes for the purposes of the probable cause inquiry that Gilhooley knew everything that Lund, Kiellach, and Skardinski knew on October 24, 2016. That means that the police collectively knew at the time that Gilhooley ordered everyone out of 1906 S. State that L.M. had already twice told the police—once to Lund and once to Skardinski—that she had been sexually assaulted at that address. DSMF ¶¶ 14-21, 30.

However, as Alexander correctly points out, L.M. had extreme amounts of drugs working their way through her system at the time of these interviews. *See* DSMF ¶ 19. Even so, the apparent injuries corroborating her story and the consistency between its two renditions on October 24 both lend her complaint more than enough credibility to justify the police relying on it. *Id.* ¶¶ 22, 30.

Similarly, the police as a whole knew that Culhane had also claimed that L.M. had left 264 McLennan on Sunday afternoon and had returned early Monday morning injured and at least mostly naked. DSMF ¶¶ 11-12. What is more, the police knew that a multi-blade razor needed to be surgically removed from L.M.'s anal cavity. *Id.* ¶ 24.

In other words, the police—and by extension Gilhooley—knew that L.M. had experienced some kind of sexual trauma through her complaint, the lodged razor, and her other injuries, and the police also knew that L.M. had specifically named 1906 S. State as the site of her attack.  Courts have found probable cause for much less—indeed, in the arrest context, a victim's complaint alone is often enough to establish probable cause.  *See, e.g.*, *Dion v. City of Utica*, 2005 WL 1174065, at *5-7 (N.D.N.Y. May 10, 2005) (finding probable cause established as matter of law on summary judgment for false arrest claim where police determined probable cause based on victim's complaint).  The Court is more than satisfied that Gilhooley had probable cause to seize 1906 S. State as a matter of law.[12]

But the more involved question is whether there were exigent circumstances justify seizing 1906 S. State without a warrant.  After reviewing the record, the Court is satisfied that no reasonable jury could conclude that there were not.

To begin, offenses do not get much graver or violent than a brutal rape and torture like the one that L.M. described.  The factor of the gravity of the offense thus cuts heavily in favor of finding exigent circumstances.  *Welsh*,

---

[12] Plaintiff's arguments to the contrary mostly boil down to the contention that there ended up being precious little evidence recovered against him beyond L.M.'s testimony.  Once again, probable cause is a measure of probabilities at the time of the police action.  *See Loria*, 306 F.3d at 1288-89 (pointing out that probable cause is a measure of probability).  Subsequent events cannot alter that calculus.

466 U.S. at 751-52.  In addition and as described above, the police made a very strong showing of probable cause that there would be evidence of the alleged rape at 1906 S. State, further supporting the legitimacy of the seizure.  *See Harris*, 770 F.3d at 234.

On top of that, even taking the facts in the light most favorable to Alexander and assuming Gilhooley and his team simply brushed past Smith into the house instead of asking for permission to enter, the police's entry was peaceful.  Dkt. 125-1, p. 58 (Smith swearing that Gilhooley and police simply pushed their way into the house).  After all, the worst that even plaintiff claims of the police is that they simply knocked on the door and then entered his house; there is no mention of breaching the door or so much as showing a firearm in the record.  *See id.*

Moreover, there was at least some suggestion of a danger that evidence would be lost if the police did not take control of 1906 S. State quickly. *Moreno*, 701 F.3d at 73.  After all, as the City defendants correctly note, L.M. had claimed that Lauren and Sheena had cleaned her after the sexual assault, heavily implying that they were being careful to prune evidence even in the immediate aftermath of the attack.  DSMF ¶ 20.  In addition, L.M. had claimed that 1906 S. State functioned as a brothel, which raised the possibility that evidence of a sexual assault would be contaminated even

without a concerted effort by L.M.'s sexual assaulters to cover their tracks. *Id.* ¶ 16.

Moreover, in this case the factor of probable cause that the suspect is in the premises to be entered collapses into the probable cause inquiry. The police wanted to seize 1906 S. State to find evidence of a crime, not necessarily plaintiff. *Harris*, 770 F.3d at 234. Because strong probable cause existed to search the property, there was by definition strong reason to believe that there evidence would be on the premises. *See Pabon*, 871 F.3d at 181-82 (noting that probable cause to search considers likelihood that evidence of crime is present).

In other words, five of the seven factors relevant to the exigent circumstances inquiry cut strongly in the City defendants' favor. Of the remaining two, it is true that there was no evidence to suggest that Alexander or anyone at 1906 S. State was armed. *Harris*, 770 F.3d at 234. Neither did the police have any particular reason to believe that plaintiff would attempt to escape. *Id.* Both factors favor plaintiff.

But neither of those factors seems particularly relevant in a search case, where the police were interested primarily in securing evidence rather than in protecting the public from an active threat. In total, four factors heavily favor a finding of exigent circumstances, a fifth factor is more or less swallowed by one of those four and thus also supports exigence, and the

remaining two factors—while cutting in Alexander's favor—are of particularly muted importance in this case.

All told, no reasonable jury could conclude that a "reasonable, experienced officer" would not believe that there was "an urgent need" to seize 1906 S. State. *Simmons*, 661 F.3d at 157. The City defendants' motion for summary judgment must therefore be granted as to Alexander's unlawful search and seizure claim for the initial seizure of 1906 S. State.[13] *See, e.g.*, *Hogan v. Caputo*, 2004 WL 1376395, at *7-8 (N.D.N.Y. June 21, 2004) (finding exigent circumstances met where grave offense of obstruction of justice from pushing police officer combined with strong showing of probable cause, evidence suspect would be at home during search, and gentle entry into home).

The second constitutional flashpoint Alexander raises concerning 1906 S. State is its search on Tuesday, October 25, 2016. That search was done under a warrant's authority, so the City defendants need not prove exigent circumstances, and the search is presumed to be reasonable. *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (holding that "a search pursuant to a warrant issued by a judicial officer upon a finding of probable cause is presumptively reasonable").

---

[13] To whatever extent plaintiff's complaint could also be read to attack the seizure of 1906 S. State as an unlawful search because Gilhooley ordered plaintiff to unlock his doors, the same logic compels the same result. Pl. Dep. 93.

Even so, a plaintiff can overcome that presumption by showing that a defendant "(1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant[;] (2) based on false statements or material omissions[;] that (3) were necessary to the finding of probable cause[.]" *Ganek*, 874 F.3d at 81 (internal citations and quotation marks omitted).

Alexander has not established that Lund's or Skardinski's reports, or for that matter the report concerning Duff's attempt to break into 1906 S. State, contained any false statements or material omissions. *Ganek*, 874 F.3d at 81. Neither would anything in the record support that claim if he had.

The closest Alexander comes is arguing that Duff's ultimate charges for the attempted break-in to 1906 S. State were different from the charges plaintiff himself faced. The Court cannot quite imagine how to connect that dot with an actively false statement in the warrant application. *Ganek*, 874 F.3d at 81. Even if it could, though, the Duff incident was completely unnecessary to establishing probable cause, because as described above the police had cleared that hurdle based on L.M.'s complaint, Culhane's corroboration, and the preliminary physical evidence alone. *See id.* (noting that any false statement or material omission must be necessary to finding of probable cause").

In other words, Alexander has failed to make a sufficient showing that any action the police undertook in seizing and searching 1906 S. State was

unreasonable or, by extension, unlawful.  Plaintiff's unreasonable search and seizure claims against the City defendants involving 1906 S. State must be dismissed.

## B. <u>Search and Seizure of Plaintiff's Vehicles</u>

However, disposing of the claims concerning 1906 S. State says nothing about Alexander's claims concerning his cars.  At the outset, the Court notes that the Second Circuit has held that shining a flashlight through car windows does not qualify as a search.  *See Molica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000) ("[A] police officer's looking through the windows into the vehicle from the outside, even when shining a flashlight to illuminate the inside of the vehicle, does not constitute a 'search' of the vehicle within the meaning of the Fourth Amendment.").

In that light, Alexander cannot rely on Gilhooley's looking into his cars from the outside to support a constitutional injury.  Plaintiff must look elsewhere to support his unreasonable search and seizure claims.

Alexander begins with Gilhooley's ordering that his cars be towed.  Unlike the search of 1906 S. State, Alexander's cars are subject to the automobile exception to the warrant requirement.  Under that exception, law enforcement can conduct even a full search of a readily mobile vehicle if there is probable cause to believe that the vehicle contains evidence of a crime.  *See United States v. Navas*, 597 F. 3d 492, 497 (2d Cir. 2010).  The general

rationale is that cars are inherently mobile—creating a kind of built-in exigency—while also being customarily subject to routine government intrusion and regulation in any case. *Id.*

In other words, the City defendants need only prove out probable cause to justify their seizing and searching Alexander's cars. They have done so, and no reasonable jury could conclude otherwise. The sight of stains that could reasonably be perceived as blood in a vehicle outside a house where a violent sexual assault allegedly took place the day before is more than enough to satisfy that standard. Dkts. 119-28, p. 2; 119-29, p. 2.

After all, even assuming in Alexander's favor that the police knew at the time Gilhooley looked into plaintiff's car that L.M. was menstruating on October 23 and 24, 2016, it would be reasonable to believe that at least some of the blood spilling from L.M. came from injury rather than natural causes. Dkt. 125-1, p. 45 (noting that L.M. may have been menstruating between October 23 and 24). After all, there was evidence that she had been cut on her arm and had a razor blade lodged in her rectum, either of which also could have caused her to bleed into a vehicle. *See* DSMF ¶¶ 22, 24 (noting razor blade lodged in L.M.'s rectum and four cuts on arm as if from multiblade razor).

In any case, whatever the source of L.M.'s blood, the undisputed facts establish that she was bleeding during the relevant timeframe. DSMF ¶ 12.

Proving that the blood was L.M.'s would put her at the scene of 1906 S. State—and thus provide evidence to corroborate her complaint—regardless of whether the blood was owed to the attack itself or to her menstruation.

Alexander nevertheless argues that the substance on the vehicles' seats was not blood. But once again, whether what Gilhooley saw was actually blood or not is entirely beside the point. What matters is whether it was reasonable for him to believe that it was blood at the time. And based on the pictures in evidence, no reasonable jury could conclude that it was unreasonable for Gilhooley to hold that belief. Dkts. 119-28, p. 2; 119-29, p. 2.

Putting that all together, a reasonable police officer would therefore believe that evidence of a crime could be found in Alexander's cars at the time Gilhooley seized them. *Pabon*, 871 F.3d at 181-82. Gilhooley had probable cause to support his seizure and search of plaintiff's cars, and plaintiff's search and seizure claims against the City defendants must therefore be dismissed. *See, e.g.*, *United States v. Joyner*, 201 F.3d 61, 74 (2d Cir. 2000) (finding towing of vehicle for holding until police could obtain search warrant reasonable where probable cause existed that evidence would be found in vehicle).

45

### C. <u>False Arrest on October 25, 2016</u>

Under either § 1983 or New York law,[14] a plaintiff claiming false arrest must show: "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Barnes v. City of N.Y.*, 2021 WL 260092, at *3 (E.D.N.Y. Jan. 26, 2021) (internal quotation marks omitted) (citing *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

Predictably enough, probable cause is one form of privilege that justifies confinement. *Savino v. City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003). Thus, "[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Weyant*, 101 F.3d at 852 (internal citations and quotation marks omitted).

Alexander first challenges his initial arrest for four crimes relating to Duff's failed attempt to break into 1906 S. State. But it would be impossible for a reasonable jury to believe that Duff's signed statement as a co-conspirator after being caught in the act did not afford Gilhooley probable

---

[14] "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted).

cause to arrest plaintiff for those crimes.  *See, e.g.*, *United States v. Johnson*, 659 F. App'x 674, 679-80 (2d Cir. 2016) (summary order) (finding probable cause met based on statements made by co-conspirator and corroborating observations by arresting federal agents).

Nevertheless, Alexander raises two arguments to undermine the legitimacy of this arrest.  First, he argues that he could not possibly have burglarized his own house, so probable cause was inherently lacking.  And indeed, that seems to be the rationale behind Barry's eventual dismissal of the burglary charge.  Dkt. 119-43, p. 5 (dismissing charge of burglary second because of difficulties proving burglary in own home).

But even assuming Alexander's argument is valid, that only accounts for one of the four charges Gilhooley brought against him that day.  He certainly could have been found guilty of conspiracy for *Duff* to break into his house, especially because he knew that he was lawfully excluded from the property at the time.  *Cf. New York v. Glanda*, 774 N.Y.S.2d 576, 581 (Sup. Ct. App. Div. 3d Dep't 2004) (noting that ownership alone does not necessarily establish that suspect has requisite license and privilege to be on property as defense to burglary).

In the alternative, Alexander argues that Duff's intrusion was just a pretext, and that Gilhooley's true motive in arresting him was to stop him from going to the store across the street to recover its video.  But that

argument is similarly misguided.  After all, it is undisputed on the record that the police recovered the video immediately after plaintiff's arrest anyway.  DSMF ¶ 104.  Even assuming that a pretextual arrest invalidates the insulating effect of probable cause,[15] plaintiff has failed to even create a question of fact as to whether the police had a pretextual motive for arresting him when they followed through with the exact course of action that he claims they were trying to prevent through his arrest.

Alexander's efforts to cloud the record by pointing to a missing portion of the video is similarly unavailing.  After all, Phinney herself complained about the missing footage and went back to the store to recover it.  Dkt. 119-17, p. 13 (Phinney's report noting that footage was missing and requesting additional footage from store's owner).

In other words, Gilhooley had probable cause to arrest Alexander on Tuesday, October 25, 2016, and plaintiff has not provided any legitimate reason why that probable cause should not insulate the City defendants from his claim of false arrest.  Plaintiff's claims concerning the October 25 arrest must be dismissed.  *See, e.g.*, *Johnson*, 659 F. App'x at 679-80.

---

[15] It does not.  *Whren v. United States*, 517 U.S. 806, 813 (1996) (foreclosing "any argument that the constitutional reasonableness of [an arrest] depends on the actual motivations of the individual officers involved").

## D. <u>False Arrest for Failure to Release Plaintiff on Bail</u>

As an alternative theory of false arrest,[16] Alexander claims that he was not released after he paid bail.  And indeed, it would seem that plaintiff did submit two bail bonds: one before the Syracuse City Court for his burglary and conspiracy charges and another before the Syracuse City Court for L.M.'s sexual assault.  *Compare* Dkt. 125-1, p. 86 (plaintiff submitting bail bond on October 29, 2016 to Syracuse City Court for drug and conspiracy charges), *with id.* at 85 (plaintiff submitting bail bond on November 3, 2016 to Onondaga County Court for sexual assault charges).

In a vacuum, having to pay bail to two different courts for two different charges would not smack of any particular impropriety.  But Alexander has provided evidence that he paid bail on Saturday, October 29, 2016[17] and was neither released nor charged with sexual assault until Sunday, October 30. Pl. Dep. 114-15.  This showing gives the Court pause.

Even so, this claim cannot survive either.  Assuming in Alexander's favor—as the Court must on a Rule 56 motion—that he was not formally charged with First Degree Criminal Sex Act until Sunday, October 30, 2016,

---

[16] False arrest and false imprisonment claims look and function identically.  *See Johnston v. City of Syracuse*, 2021 WL 3930703, at *5 (N.D.N.Y. Sept. 2, 2021) (dismissing false imprisonment claims as duplicative of false arrest claim relying on same factual predicate).  For consistency's sake, the Court will style plaintiff's false imprisonment claim as a false arrest claim.

[17] Plaintiff testified at his deposition that he paid bail on Friday, October 28, 2016. Pl. Dep. 114-15.  However, his own documentary evidence shows that he first posted bail on October 29, 2016, a Saturday.  Dkt. 125-1, p. 86.  Pro se deference or no, the Court will rely on the documents.

the Court sees no possible constitutional injury in plaintiff's claim.  After all, there is no general requirement that an accused who has posted bail be released immediately unless the judge granting bail specifically orders an immediate release.  *See Sizer v. Cnty. of Hennepin*, 393 F. Supp. 2d 796, 798-800 (D. Minn. 2005) (granting motion to dismiss claim of false imprisonment for failure to release plaintiff for 10.5 hours because judge did not order immediate release).

In a vacuum, of course, whether failing to release Alexander for a full day may amount to a false arrest would be an involved question that may even require a jury to answer.  But this case is no vacuum, and its unique atmosphere makes that question academic.

After all, the Supreme Court has created a bright-line rule that a plaintiff does not experience a constitutional injury for false arrest if he is arraigned within forty-eight hours absent some defect in the arraignment itself.  *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 53, 56 (1991) (describing rule allowing warrantless arrest provided that suspect promptly have hearing to determine probable cause within forty-eight hours of arrest).  And even under the version of the facts most favorable to Alexander, he was arraigned on charges of First Degree Criminal Sex Act the day after he posted bail. Dkt. 125-1, p. 86; Pl. Dep. 114-15.

To sum up, Alexander posted bail on October 29, 2016, and was ordered released.  Dkt. 125-1, p. 86.  But the order releasing him did not require that the release be immediate.  *Id.*  Then, he was arraigned by a separate court on October 30, 2016.  Pl. Dep. 114-15; *see* Dkt. 125-1, p. 85 (plaintiff paying bail for second time to Onondaga County Court, rather than to Syracuse City Court).  His subsequent re-arraignment before a different court therefore provided a forty-eight-hour grace period during which his confinement on that second batch of charges could not be considered unlawful without further evidence of mischief, and in the absence of a requirement that his release for his initial charges be immediate, the Court holds as a matter of law that plaintiff suffered no constitutional injury.  *McLaughlin*, 500 U.S. at 56.

The Court does not reach this conclusion lightly.  After all, one could easily imagine this outcome incentivizing police to charge suspects piecemeal, requiring them to pay bail repeatedly for the same factual predicate.  Alternatively, other courts have declined to extend *McLaughlin* to allow for a per se forty-eight-hour timeframe to release a defendant after he pays bail.  *See, e.g.*, *Lynch v. City of N.Y.*, 335 F. Supp. 3d 645, 656 (S.D.N.Y. 2018) (rejecting argument that *McLaughlin*'s forty-eight-hour rule should apply to release on bail in addition to arrest before arraignment).

Nevertheless, the Court is satisfied that the unique circumstances of this case mean that this holding neither creates that perverse incentive nor extends *McLaughlin* after bail is paid. For one thing, the outcome would have been different if the police had charged Alexander twice for crimes arising out of the same transaction before the same court. They did not. L.M. had not yet even identified plaintiff as one of her alleged attackers when he was arrested on October 25, 2016, so the police could not have charged him with First Degree Criminal Sex Act in any case. DSMF ¶ 154 (L.M. claiming for first time that plaintiff had sexually assaulted her).

Additionally, Alexander's two sets of charges—one for a relatively mild conspiracy to break into 1906 S. State and the other for a gruesome sexual assault and torture—were of completely different orders of magnitude and subject to the jurisdiction of two completely different courts. *See* COURTS OUTSIDE NEW YORK CITY, https://nycourts.gov/courts/cts-outside-nyc.shtml (last visited 11/30/2021) (describing criminal jurisdiction of city courts as "over misdemeanors and lesser offenses" while jurisdiction of county courts is over "all crimes committed within the [c]ounty").

In other words, the police were jurisdictionally prohibited from charging Alexander with First Degree Criminal Sex Act in Syracuse City Court and lacked the evidence to charge him with that crime on October 25, 2016. Under these precise facts, no reasonable jury could conclude that plaintiff

52

suffered a constitutional injury for not being released after he paid bail to the

Syracuse City Court until he could be arraigned by the Onondaga County

Court.  In so holding, the Court is not extending *McLaughlin*.  It is simply

applying it to protect the Onondaga County Court's jurisdiction by not

allowing a lower court's release order to trump a proper arraignment from

the County Court.  *Lynch* is therefore inapposite, and plaintiff's false arrest

claim stemming from the City defendants' alleged failure to release him on

bail must also be dismissed.  335 F. Supp. 3d at 656.

### E. **Malicious Prosecution**

Turning at last to Alexander's malicious prosecution claim, the Court

notes that probable cause stands yet again as the primary obstacle.  After all.

New York law[18] recognizes four elements of a malicious prosecution claim:

(1) the initiation of a proceeding; (2) that terminated favorably to plaintiff;

(3) lacking probable cause; and (4) malice.  *Savino v. City of N.Y.*,

331 F.3d 63, 72 (2d Cir. 2003) (citing *Colon v. City of N.Y.*, 455 N.E.2d 1248,

1250 (1983)).  Obviously, then, probable cause amounts to a complete defense

for a claim of malicious prosecution.  *Savino*, 331 F.3d at 72.

---

[18] Once again, § 1983 claims for malicious prosecution are treated much the same as claims under New York law. *See Mayzick v. Cnty. of Nassau*, 32 F. Supp. 3d 399, 403 (E.D.N.Y. 2014) (treating § 1983 and state law malicious prosecution claims identically, including presumption of probable cause following indictment).

On top of the defense of probable cause, if the initiated proceeding culminated in an indictment against the plaintiff, a court must presume that probable cause existed unless the plaintiff can establish that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino*, 331 F.3d at 72 (internal citations omitted).

In this case, Alexander was charged with crimes in four batches, so reading the record as favorably to him as possible, there are four apparent windows for him to claim malicious prosecution.  First, he was charged with four crimes relating to Duff's attempted break-in to 1906 S. State. DSMF ¶¶ 101-03.  Second, plaintiff was charged with several drug crimes after the police searched his house.  *Id.* ¶ 146.  Third, plaintiff was charged with First Degree Criminal Sex Act at some point after L.M. spoke to the police on October 28, 2016.  *Id.* ¶ 158.  Fourth, plaintiff was charged with First Degree Unlawful Imprisonment after L.M.'s grand jury testimony.  *Id.* ¶ 197.

The first batch of charges has already been dealt with.  Duff's signed statement as a co-conspirator established probable cause to support Alexander's arrest on October 25, 2016, and thus his malicious prosecution claim stemming from that arrest and any subsequent action taken on it must be dismissed.  *See, e.g.*, *Johnson*, 659 F. App'x at 679-80.

The second batch—Alexander's charges for drug crimes after the search of 1906 S. State—breaks new ground but is equally straightforward to resolve. The police found a chunk of cocaine on plaintiff's dresser in his bedroom, with a bottle of a cutting agent, digital scales, and hundreds of small plastic bags nearby.  DSMF ¶¶ 142-43.  That evidence alone is enough to establish probable cause.  *See, e.g.*, *Smith v. City of N.Y.*, 2016 WL 5793410, at *5 (S.D.N.Y. Sept. 30, 2016) (finding probable cause to arrest based solely on plaintiff's constructive possession of drugs in his bedroom).  That L.M. had also told the police that plaintiff dealt cocaine out of 1906 S. State was even more icing on an already well-covered cake.  DSMF ¶ 18.  Plaintiff's malicious prosecution claims based on his drug arrest must therefore also be dismissed.

Third, Alexander's challenge to the City defendants' decision to charge him with First Degree Criminal Sex Act is equally defective.  From the start, the Court repeats that a victim's complaint standing alone is enough to establish probable cause.  *Dion*, 2005 WL 1174065, at *5-7 (finding probable cause based solely on victim's complaint); *Miloslavsky*, 808 F. Supp. at 355 (holding that veracity of victim's complaint is assumed).  And L.M.'s complaint did not stand alone; once again, the police corroborated it through observations of her condition after the attack.  DSMF ¶¶ 22, 24.

Unimpeached, this evidence easily clears the threshold of probable cause. But Alexander makes four attempts to undercut its legitimacy and defeat the

City defendants' showing.  First, plaintiff argues that he could not have participated in L.M.'s attack because he returned home at around 4:00 p.m. on October 23, 2016, and therefore was not there when L.M. claims that she was assaulted.  Pl. Dep. 75-76.

Alexander's attempted alibi misses the mark.  Culhane claimed that L.M. only left 264 McLennan at around 4:00 p.m. to head to 1906 S. State, which puts L.M. first getting to plaintiff's house at the same time he did. DSMF ¶ 11.  Besides, L.M. consistently claimed that she spent much of the night in the basement of plaintiff's house, making his absence in the early afternoon—but admitted presence for the rest of the night—beside the point. *Id.* ¶¶ 19-20, 126, 154; Pl. Dep. 75 (plaintiff testifying that he was hime in his bedroom by himself for most of night of October 23, 2016).  In fact, the first time L.M. actively accused plaintiff of being involved in her attack specifically left him out of events until she had already been tied up in the basement for hours.  DSMF ¶ 154.  Plaintiff not arriving until after 4:00 p.m. thus in no way undermines the credibility of her narrative.

Alexander also argues that his cars never moved after he got home at 4:00 p.m. on Sunday, October 23, 2016 until he went to work at 5:46 a.m. the next morning.  PSMF ¶¶ 149.  He claims that this evidence proves that L.M.'s story of being transported to several locations that night was false.

However, that *Alexander's* cars did not move does not by itself disprove that L.M. was transported in a car that night. After all, the video footage shows that there was substantial traffic coming through 1906 S. State during that time. Dkt. 119-17, p. 13. Any of those vehicles could also have transported L.M. And even if they had not, L.M.'s corroborated and oft-repeated—and otherwise corroborated—story of sexual assault could well withstand the hit to her credibility even if it turned out that she had not in fact been transferred to other locations that night. *Cf., e.g.*, *United States v. Paquin*, 216 F. App'x 46, 49 (2d Cir. 2007) (summary order) (finding testimony of witness in criminal case capable of credit by jury where generally consistent and corroborated despite some inconsistencies).

As a third argument, Alexander points out that L.M. first identified him specifically as being involved in the sexual assault during the fourth time she told her story, on October 28, 2016. DSMF ¶ 154. Under these circumstances, the Court is again unmoved by plaintiff's argument. Between recovering male DNA on her mouth, a spermatozoan from a perianal swab, and the multiblade razor lodged in her rectum, there was strong evidence to support the notion that L.M. had been sexually assaulted. DSMF ¶ 24, Dkt. 119-17, p. 14. Investigators were more than justified in assuming—as Phinney had already expressed—that she would be hesitant to reveal her abuser and risk exposing herself to more attacks. DSMF ¶ 111.

What is more, L.M. had from the beginning told investigators that she had been threatened with a death like Darrell Johnson's if she went to the police, providing evidence to support her fears from the beginning.  DSMF ¶¶ 20-21. Put together, that it took L.M. some time before she was willing to actively identify her attacker would not by itself undermine a finding of probable cause when she ultimately did.  *Cf. Garcia v. Walsh*, 348 F. App'x 618, 620-21 (2d Cir. 2009) (summary order) (noting that probable cause does not demand "hard certainties" and finding challenge to credibility of inculpating witnesses unavailing in challenge to conviction).

Alexander similarly objects that L.M. had so many drugs in her system at the time Lund, Kiellach, and Skardinski took her statement that she could not possibly be considered credible.  Certainly, the amount of drugs in her system on October 24, 2016 took its toll on L.M.'s credibility, and in fact ended up being instrumental in the decision to dismiss the charges against plaintiff.  DSMF ¶ 206.  However, that L.M.'s statements were considered too unreliable to support a conviction beyond a reasonable doubt does not mean that they did not rise to the level of probable cause.  *See United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) (noting that "standard for probable cause is lower than that for conviction").  Especially not where, as here, L.M.'s statement was largely consistent (at least until she testified

before the grand jury) and corroborated by apparent injuries.  DSMF ¶¶ 11, 19-20, 22, 24, 126, 154.

Accordingly, notwithstanding Alexander's attacks, the Court is satisfied as a matter of law that the City defendants had probable cause to prosecute plaintiff for First Degree Criminal Sex Act.  His malicious prosecution claim for this count must also be dismissed.

Fourth and finally, Alexander challenges his prosecution for First Degree Unlawful Imprisonment.  At the start, the Court notes that L.M.'s story of being trapped and bound in the basement of 1906 S. State is of one piece with her story of sexual assault.  Thus, the probable cause analysis is the same, and the City defendants had probable cause to charge plaintiff on this count for the same reasons discussed above.

In addition, though, the grand jury ultimately voted in favor of charging Alexander with First Degree Unlawful Imprisonment, meaning that the Court must presume probable cause in any case.  *Savino*, 331 F.3d at 72. Nevertheless, plaintiff tries to argue that the true-bill was obtained through fraud.  Those arguments also fail.

Alexander first objects to the indictment on the grounds that he was denied the opportunity to testify before the grand jury.  To his point, under New York Criminal Procedure Law § 190.50(5)(a), a defendant has a right to appear before a grand jury if he serves written notice of his desire to testify

on the prosecutor's office and provides an address to receive communication from that office in return.  Plaintiff made that request and was given a timeslot to testify at 9:00 a.m. on Friday, November 4, 2016.  Dkt. 125-1, p. 77.

However, Alexander withdrew that request on November 3, 2016 and voluntarily declined to testify.  Dkt. 125-1, p. 76.  That he did not testify because he chose not to—and would have been permitted to if he had so chosen—does nothing to undermine the legitimacy of the grand jury process. *See id.* at 77 (offering plaintiff opportunity to testify before grand jury). Plaintiff's objection is therefore meritless.

Similarly, Alexander has failed to carry his burden of proving that the City defendants defrauded the grand jury to secure the indictment.  *Savino*, 331 F.3d at 72 (holding that plaintiff must prove fraud in securing indictment).  There is no evidence at all to support that Gilhooley or the prosecutors knew that any testimony L.M. provided against plaintiff was false.  Plaintiff has pointed to no motive that they might have had to frame

him, no evidence of efforts to coach L.M. to inculpate him, or any other attempt by them to deny him a fair shake in front of the grand jury.[19]

All told, the City defendants have established that they acted under cover of probable cause throughout their entire investigation into Alexander. His malicious prosecution claims must be dismissed, and his complaint must be dismissed in its entirety as to the City defendants.[20]

## F. **Plaintiff's Claims Against Onondaga County**

Curiously, though, the case remains active against Onondaga, who has made little effort at any point thus far to defend itself. This puts the Court in the unenviable position of either proceeding to trial on several claims whose merits have been put in extreme doubt by the present motion practice, or to engage in unorthodox practices of its own to ensure that it only takes that path if it is strictly necessary.

---

[19] Jackson, perhaps, could have made out such a claim. The police knew, for example, that Lawrence had demanded a bribe from Jackson in exchange for not being dragged into the investigation. Dkt. 125-1, p. 65. And it would strike a casual observer as strange that suddenly during L.M.'s grand jury testimony—but after Lawrence demanded the bribe—Jackson became a much more prominent figure in L.M.'s story. In fact, she added a new chapter during her grand jury testimony specifically accusing Jackson (assuming that he is the Q to whom she was referring) specifically of even more truly grotesque acts of sexual assault. *See* DSMF ¶¶ 186-89. Even then, though, there is no direct suggestion that the investigators or prosecutors manipulated the grand jury process to get this evidence out.

[20] To whatever extent plaintiff is attempting to state malicious prosecution claims against Assistant District Attorney Barry, the Court notes that she has never been a defendant in this case. Nor will plaintiff be allowed to amend his complaint at this late stage to include her giiven the futility of ginning up claims against a defendant that would fail for the same reasons that compelled the Court to dismiss the remainder of plaintiff's claims.

The Court chooses the latter option. Under Rule 56(f)(1), the Court may grant summary judgment even for a nonmovant after providing notice to the parties that it is mulling that option and giving the parties time to respond. Accordingly, the Court orders Alexander and/or Onondaga to show cause why the Court should not grant summary judgment against plaintiff's remaining claims against the County no later than Tuesday, January 4, 2022.

## V. **CONCLUSION**

There is precious little doubt that L.M. suffered a truly appalling sexual assault in late October of 2016. Her injuries were simply too apparent, and the hard evidence—though inconclusive as to the culprit—was too clear to reasonably entertain otherwise. All the same, prosecutors determined that proving Alexander's responsibility for that crime beyond a reasonable doubt was too steep a hill to climb, and so plaintiff was released.

That set of facts, an apparent certainty on this record, can peacefully coexist with finding probable cause throughout the investigation into Alexander as a suspect of L.M.'s attack. And indeed it does. Plaintiff's objections to the investigation into L.M.'s sexual assault are one and all meritless. His complaint—as to the City defendants at least—must be dismissed.

Therefore, it is

ORDERED that

62

1. Defendants the City of Syracuse and Detective Rory Gilhooley's motion for summary judgment is GRANTED;

2. Plaintiff Troy Alexander's complaint is DISMISSED as against defendants the City of Syracuse and Detective Rory Gilhooley;

3. Cross claimants the City of Syracuse and Rory Gilhooley's cross claim against cross defendant the County of Onondaga is DISMISSED as moot;

4. Cross claimant the County of Onondaga's cross claim against cross defendants the City of Syracuse and Rory Gilhooley is DISMISSED;

5. Defendants the City of Syracuse and Detective Rory Gilhooley's motion to examine certain evidence submitted to the Court by plaintiff Troy Alexander is DENIED as moot;

6. Defendants the City of Syracuse and Detective Rory Gilhooley are DISMISSED from this case; and

7. The remaining parties are ordered to show cause no later than Tuesday, January 4, 2022, why the Court should not grant summary judgment as to the rest of plaintiff Troy Alexander's complaint.

IT IS SO ORDERED.

Dated:  December 1, 2021
        Utica, New York.

David N. Hurd
U.S. District Judge